

Cause No. 0509061-L
United States District Court
For the Northern District of Texas
Dallas Division

| | | |
|---|---|---|
| Jasper L. Allen | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 3:05-CV-2024-D |
| | § | |
| Lone Star HMA, L.P. d/b/a | § | |
| Mesquite Community Hospital, a | § | |
| subsidiary of Health Management | § | |
| Associates, Inc. | § | |
| Defendant. | § | |

## Plaintiff's Second Amended Petition

Plaintiff Jasper L. Allen ("Allen") files this Second Amended Petition complaining of Lone Star HMA, L.P. d/b/a Mesquite Community Hospital, a subsidiary of Health Management Associates, Inc. and would show the Court as follows:

### Parties

1. Plaintiff Jasper L. Allen is an individual who lives in Texas and is a resident of Collin County, Texas.

2. Defendant has appeared and answered in this lawsuit.

### Venue

3. Venue is proper in Dallas County, Texas as all claims arising from Plaintiff's employment and termination occurred in Dallas County, Texas.

### Factual Background

Plaintiff's Second Amended Petition - 1

4. Allen began working for Mesquite Community Hospital on June 10, 1997. During his employment, Allen was the Director of Facilities Management. His job responsibilities included environmental services; linen services; plant operations, maintenance and construction; biomedical engineering; security services; hazardous materials and waste coordinator; and safety officer. Allen supervised a team of sixty-five total employees. During his employment, Allen was given high marks for his performance and his willingness to take on additional responsibilities. In his final performance evaluation before his termination, Allen received an overall rating of "5," which is an outstanding performance.

5. In 2002, Mesquite Community Hospital was purchased by Health Management Associates, Inc. ("HMA"). HMA also purchased the other hospital located in Mesquite, Medical Center of Mesquite. Instead of combining the operations of the two hospitals, HMA decided to continue operating both hospitals as two separate and independent units.

6. After HMA purchased Medical Center of Mesquite, it made numerous changes to the staff at Medical Center of Mesquite. This provided an opportunity for several directors to provide services to Medical Center of Mesquite. For example, the Directors of Pharmacy and Cardiopulmonary departments at Mesquite Community Hospital also became the Directors of those departments at Medical Center of Mesquite. It was desirable for the Directors to do both positions since the Directors earned additional pay for handling both positions.

7. In August 2004, the Director of Facilities from Medical Center of Mesquite was terminated. Allen was interested in being the Director of Facilities for both Mesquite

Community Hospital and Medical Center of Mesquite. On August 24, 2004, Allen contacted Ray Deblasi, the CEO of Mesquite Community Hospital, and asked permission to pursue the Director position at Medical Center of Mesquite. Allen wanted to continue to handle his current job and take on the additional director responsibilities as other employees had done.

8. To Allen's surprise, Deblasi became very upset and angry. Deblasi recommended to Allen that Allen not continue to pursue the directorship at the other hospital. He used very harsh and angry tone of voice when communicating to Allen that Allen should not pursue the joint directorships.

9. Allen felt that he was being treated differently in his terms and conditions of employment because other employees were allowed to handle both directorships. Specifically, Allen is African American and the other employees who were allowed to be responsible for both directorships were white employees. Allen went to speak with Cynthia Tiblier, the Director of Human Resources and advised Tiblier of his conversation with Deblasi. Allen also told her that he felt that was being discriminated against because the directors who were allowed to work at both hospitals were white while he, an African American employee, was not being given the same opportunities.

10. The next day Deblasi sent Allen an email explaining why he turned down the request, indicating that the facilities management director is a "hands on" position. Allen believed that Deblasi's email was just a pretext for discrimination for the positions held by other directors handling joint directorships were also "hands on" positions and had important responsibilities that directly related to patient care.

Plaintiff's Second Amended Petition - 3

11. The week after Allen complained to Tiblier, Allen was called into the office of his immediate supervisor, Jennifer Varnador, the Chief Operating Officer. Varnador told Allen that in the future, she was going to be working more closely with the Construction and Maintenance Supervisors who had previously reported to Allen. Essentially, those supervisors were now to report directly to Varnador instead of Allen. When Allen asked why, Allen was told only that he should just concentrate on the other areas under his supervision. Allen protested this decision because he viewed it as a form of demotion and as retaliation for his earlier complaint. Allen again went to complain to Tiblier and advised her that he considered this adverse employment action to be in retaliation for his earlier complaint and that he feared for his job.

12. Over the next ten months, many things happened that confirmed Allen's fears that his job was in jeopardy. Allen had great difficulty obtaining administrative approval for tasks that were essential to his performance of the job. He also had great difficulty obtaining the assistance necessary to accomplish certain job tasks.

13. In October 2004, just two months after his complaint, David Maxwell was hired as an Assistant Administrator. Varnador advised Allen that the Facilities Management Department would now be placed under Maxwell and that Allen was now to report to Maxwell. To Allen's knowledge, no other Director was required to report to an Assistant Administrator.

14. As previously noted, after Allen's complaint, many things happened that confirmed his fears that his job was in jeopardy as a result of his complaint. One specific issue related to the Joint Commission on Healthcare Accreditation survey given to the hospital every three years. ("JCHAO"). Mesquite Community Hospital had last

Plaintiff's Second Amended Petition - 4

been surveyed in 2002. The areas of the survey that fell under Allen's supervision related to the Environment of Care for the hospital. During each survey, the survey team evaluates seven environmental care plans to assure that all policies and procedures are updated to meet state and federal safety regulations and codes and the survey team makes any needed recommendations at that time. The survey team also conducts a physical tour of the hospital to assure that the hospital's physical plant and equipment are compliant. If there are any issues, the hospital is then given three years to put the recommendations into effect. If any additional problems are recognized by the facility department or as a result of needed changes in the life safety features in the hospital after a completed JCHAO survey, but before the next scheduled survey, it is put into what is known as "Plans for Improvement" ("PFI") and then entered into the "Statement of Conditions" document. The Statement of Conditions document is to let the next survey team know that the problem has been recognized and is being appropriately addressed by the hospital.

15. Between June 1997 (Allen's hire date) and prior to the survey in 2005 and Allen's termination, there had been two JCHAO surveys conducted. No one was ever terminated for failing to implement the recommendations of those surveys.

16. The 2002 survey team recommended that the fire doors at Mesquite Community Hospital be replaced. Because this was a large capital expenditure (in excess of $50,000.00), Allen had to obtain budgetary approval to replace these doors. Allen submitted a budgetary request for approval for the fire doors replacement in 2003 and 2004. Both times, Allen was not granted budgetary approval for this capital expenditure.

17. During 2005, Allen was aware that the fire doors needed to be replaced prior to the upcoming JCHAO survey. Allen made numerous efforts to obtain approval to get the fire doors replaced. Allen repeatedly explained the need to hospital management that it needed to give him approval to replace the fire doors. He explained because of the lead time it would take to receive and install the fire doors, he needed quick approval. For months, Allen had communicated with Maxwell, Varnador and Jim Eaton (the Chief Financial Officer) about the need to replace the fire doors since this would be noted on the 2005 JCHAO survey. Allen's efforts were stymied at every turn. Just *one* week before the surveyors were scheduled to arrive, Allen finally received this approval. Naturally, there was not adequate time to order and install the fire doors in that week before the JCHAO survey

18. Allen also knew that there was an issue involving the fire damper and firewall penetrations that needed to be addressed. Allen discussed the fire damper and firewall penetrations with Defendants' management on many occasions. Allen knew these needed to be included as a PFI in the Statement of Conditions because the survey team was likely to raise this issue. It was important for the hospital to show that it knew of the problem before it was raised by the survey team. During a meeting in Atlanta, J. Burk confirmed for both Allen and Maxwell that the fire damper and firewall penetrations needed to be included as PFI in the Statement of Conditions. However, Maxwell specifically instructed Allen on two separate occasions that Allen was not to include the fire dampers and firewall penetrations as a PFI in the Statement of Conditions prior to the 2005 JCAHO survey.

Plaintiff's Second Amended Petition - 6

19. Allen was terminated on May 16, 2005 in a meeting with Maxwell and Tiblier. Allen asked why he was being terminated and was told by Maxwell that it was because he failed to comply with the recommendations of the 2002 JCHAO survey in regard to replacing the fire doors and failed to include the fire dampers and firewall penetrations in the PFI for the Statement of Conditions.

20. This stated reason is a pretext for discrimination as Allen had made every possible effort to comply with the requirements of the 2002 JCHAO survey. He was denied budgetary approval in 2003 and 2004 for the capital expenditure to replace the fire doors. Allen's efforts in 2005 (notably occurring after he complained of discrimination and retaliation) were thwarted and stymied by hospital officials. Yet, despite Defendant's failure to timely act on Allen's request to grant him approval to replace the fire doors, Allen was terminated for allegedly for failing to have the fire doors replaced before the survey. Furthermore, Allen made every effort to include the fire damper and firewall penetrations as a PFI in the Statement of Conditions. He was expressly instructed by Maxwell to exclude those items. Maxwell, despite his express instruction that Allen leave those items out of the PFI, then cited that exclusion as a justification for Allen's termination.

21. Allen timely filed a Charge of Discrimination with the EEOC that was dually filed with the Texas Workforce Commission. Allen received Notices of Right to Sue and timely files this action.

## Causes of Action

## Race Discrimination

22. Defendant discriminated against Allen by refusing to consider him to assume a joint directorship for both Mesquite Community Hospital and Medical Center of Mesquite. Defendant had allowed four different white directors to assume joint responsibility for their respective departments at both hospitals. These white directors were directors of departments that provided critical services to direct patient care. Yet, when Allen approached Deblasi and requested to pursue a joint directorship of both hospitals, Allen's requests were rejected in a harsh and hostile tone, with Deblasi becoming very angry with Allen for even making such a request.

23. Allen was subjected to differing terms and conditions of employment than other white employees in violation of Title VII, 42. U.S.C. § 1981 and Texas Labor Code § 21.051.

24. Allen has been damaged by this racial discrimination and seeks to recover his damages from Defendant. He seeks to recover damages for his back pay and lost benefits, front pay, compensatory damages and punitive damages. Allen also seeks to recover his reasonable and necessary attorneys' fees incurred in pursuing these claims.

**Retaliation**

25. Allen engaged in protected activity in August 2004, by filing complaints with Cynthia Tiblier in Defendant's Human Resources Department. Allen specifically complained of racial discrimination and subsequently complained of retaliation.

26. Defendant did not investigate Allen's complaints or take any action in regard to his concerns. Instead, Allen was effectively demoted when Construction and Maintenance Supervisors who normally reported to him were instructed to report to

Allen's boss, Varnador. Varnador had never supervised these Construction and Maintenance Supervisors before Allen engaged in protected activity. Allen's job duties were reduced as a result of that move.

27. Allen was also reassigned to report to an Assistant Administrator Maxwell. No other employee at the director level was required to report to an Assistant Administrator as was Allen.

28. Allen was subjected to harsh treatment and adverse employment actions after he engaged in protected activity. Defendant treated Allen differently than other director level employees. Defendant took actions that made it impossible for Allen to perform his job.

29. Just ten months after Allen engaged in protected activity, Defendant terminated Allen based on the reason that he had not complied with the 2002 JCHAO survey recommendation to have the fire doors replaced and because he failed to include the fire damper and fire wall penetration issues in the PFI. However, Defendant set Allen up to fail. Defendants thwarted Allen's every effort to comply with that recommendation from the 2002 JCHAO survey by refusing to give him budgetary approval in 2003 and 2004 and ignoring his request in 2005 until it was too late to have those items completed before the survey. Maxwell specifically instructed Allen not to include the fire damper and fire wall penetration issue in the PFI.

30. Allen was subjected to differing terms and conditions of employment in that he was terminated allegedly for failing to meet the 2002 survey recommendation. However, no other employee of Defendant has been terminated before for failing to

comply with a survey recommendation. Accordingly, Defendant's rationale for terminating Allen is pretext for discrimination and retaliation.

31. These retaliatory activities are a violation of Title VII, 42 U.S.C. § 1981 and Texas Labor Code § 21.055.

32. Allen has been greatly damaged by Defendant's retaliatory conduct. Allen was terminated and suffered a loss of wages and benefits. Allen seeks to recover all damages he has suffered from Defendant for its discriminatory and retaliatory conduct including back pay and benefits, front pay, compensatory damages and punitive damages. Defendants' actions were committed willfully and maliciously and with the knowledge that they were retaliatory. Allen also seeks to recover his reasonable and necessary attorney's fees incurred in pursuing this claim.

### Prayer

WHEREFORE, Plaintiff Jasper L. Allen, II requests that this Court, upon trial, enter a judgment awarding Allen damages for Defendant's violations of Title VII, the Texas Labor Code, 42 U.S.C. § 1981 and for such other and further relief to which he is justly entitled including attorneys' fees, prejudgment and post-judgment interest, and for such other and further relief to which he is justly entitled.

Respectfully submitted,

Kleiman Lawrence Baskind Fitzgerald LLP
8750 North Central Expressway, Suite 777
Dallas, Texas 75231
214.265.7400
214.265.7411 (Facsimile)

By: _____
Karen K. Fitzgerald
State Bar No. 11656750

Attorneys for Plaintiff

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been mailed, certified mail, return receipt requested and regular mail to the following on the ___day of November, 2005:

Mike Birrer
Carrington, Coleman, Sloman & Blumenthal LLP
200 Crescent Court, Suite 1500
Dallas TX 75201

_____
**Karen K. Fitzgerald**

Plaintiff's Second Amended Petition - 11